**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
| MOHSIN Y. MEGHJI, LITIGATION ADMINISTRATOR, AS REPRESENTATIVE FOR THE POST-EFFECTIVE DATE DEBTORS, | ) ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) | Adversary Proceeding No. [●]_(MG) |
| v. | ) |  |
|  | ) |  |
| GALIA BEN-ARTZI, GUY BEN-ARTZI, EYAL HERTZOG, YEHUDA LEVI, BPROTOCOL FOUNDATION, LOCALCOIN LTD., and BANCOR DAO, | ) ) ) ) |  |
|  | ) |  |
| Defendants. | ) |  |

_____

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## ADVERSARY COMPLAINT

Plaintiff Mohsin Y. Meghji, in his capacity as Litigation Administrator for Celsius Network LLC (**"Celsius"**), by and through his undersigned counsel, hereby files this adversary complaint (**"Complaint"**) against Defendants Galia Ben-Artzi, Guy Ben-Artzi, Eyal Hertzog, Yehuda Levi (together, the **"Individual Defendants"**), the BProtocol Foundation (the **"Foundation"**), LocalCoin Ltd. (**"LocalCoin"** and, with the Foundation, the "**Entity Defendants**"), and Bancor DAO, and alleges the following facts and claims based upon information and belief based on reasonable due diligence regarding the facts and circumstances of the Debtor's bankruptcy cases, Plaintiff's ongoing investigation, and the documents and information currently available to Plaintiff.

## PRELIMINARY STATEMENT

1.      Defendants Galia Ben-Artzi, Guy Ben-Artzi, Eyal Hertzog, and Yehuda Levi co-founded LocalCoin Ltd. and the BProtocol Foundation to develop and launch the Bancor Protocol (the **"Protocol"**).  The Protocol, which launched in 2017, is a platform that enables users to trade cryptocurrency.

2.      The Protocol's main product is an automated market maker, or "AMM," where users can trade crypto assets via "liquidity pools." The assets in the pools are contributed by "Liquidity Providers," or "LPs," who deposit crypto assets in the pools in exchange for fees and incentives.

3.      The AMM can only function if there is sufficient liquidity in the pools.  But while LPs were crucial to the Protocol's success, many were reluctant to deposit their crypto assets with the Protocol because their investments were likely to incur "impermanent loss."  Impermanent loss, or "IL," is endemic to AMM liquidity pools and constitutes losses incurred by investing

crypto assets in an AMM rather than simply holding them. As explained by Defendants, impermanent loss "occurs in AMM pools when the prices of the tokens in a pool diverge in any direction. The more divergence, the greater the IL, reducing an LP's profits from trading fees [and] rewards."

4.      To overcome this obstacle to attracting LPs, the Protocol introduced "impermanent loss protection," which worked as a type of "insurance" against IL. An early version of the Protocol provided IL protection that vested over time, but the third version ("v3") of the Protocol, launched in May 2022, provided immediate, 100% protection against IL.

5.      Impermanent loss protection was, according to Defendants, to be paid for by fees generated by the Protocol. At all times, however, the fees that the Protocol earned were insufficient to cover the cost of IL protection for all LPs – indeed, they covered only a fraction of the unrealized IL in the system. Therefore, if enough LPs withdrew their assets at the same time, there would be insufficient funds to provide IL protection for all of the withdrawals, and the Protocol would suffer a "death spiral," similar to a run on a bank.

6.      Defendants knew that the Protocol did not generate sufficient fees to cover IL protection for all LPs, but instead of informing investors of this fact, they concealed it and continued to advertise IL protection to draw in more LPs to the Protocol.

7.      On June 19, 2022, Bancor's luck ran out: a spike in withdrawals triggered significant payment obligations to v3 investors. Instead of making those payments, Defendants "paused" impermanent loss protection, leaving withdrawing LPs to incur the IL that Defendants had promised to protect them from.

8.      At the time that Defendants "paused" IL protection, Celsius had 14,878 ETH invested in the Protocol. Because Defendants failed to provide the IL protection they had

promised, Celsius received only 8,338 ETH when they withdrew their investment from the Protocol. Plaintiff brings this adversary proceeding to recover the value of the 6,540 ETH that Celsius lost as a result of Defendants' failure to provide IL protection.

## II.    PARTIES

### A.    Plaintiff

15.    Plaintiff Mohsin Y. Meghji is the Liquidation Administrator for Celsius Network LLC. Mr. Meghji was appointed Liquidation Administrator pursuant to the *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3972] and the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (Conformed for MiningCo Transaction)* [Docket No. 4289].

16.    Prior to declaring bankruptcy and entering Chapter 11, Celsius and its affiliates constituted one of the largest cryptocurrency-based finance platforms and Bitcoin mining companies in the world and provided financial services to institutional, corporate and retail clients across more than 100 countries.

17.    Celsius was founded in 2017 to be one of the first crypto platforms that would allow users to transfer their digital assets and (a) earn rewards on such assets and/or (b) take out loans using those transferred assets as collateral. The rewards offered by Celsius varied by the type and amount of crypto asset transferred to the Celsius platform.

18.    The Celsius business model was centered on deploying digital assets to generate income for Celsius and its operations and growth. Among other things, Celsius made loans of fiat currency and "stablecoins"—crypto currency pegged to fiat currencies like the U.S. dollar (USD)—to third-party retail borrowers, but only if the borrower posted collateral in the form of

cryptocurrency in excess of the amount loaned.  In or around late 2019 and early 2020, Celsius began to consider additional revenue generating investment strategies, such as staking and DeFi activities.

19.    Staking refers to providing cryptocurrency coins, like ETH, to a third-party platform for the purpose of earning revenue, usually in the form of a coin or other "reward." Staking does not involve trading one form of cryptocurrency for another, or otherwise speculating in cryptocurrency assets. The principal, staked coins are not exchanged for other forms of currency. While the staked coins may in some cases be subject to a lockup period, the original staking party has the right to have the ETH or other coins it staked at the platform returned.

20.    DeFi generally refers to certain activities on a blockchain designed to provide financial services like borrowing, lending and market-making without an institutional intermediary, often utilizing so-called "smart contracts."  Smart contracts essentially are programs stored on a blockchain that run when predetermined conditions are met.  Smart contracts can be used to automate the execution of an agreement so that the outcome is certain, without any intermediary's involvement.

**B.    Defendants**

21.    Defendant Galia Ben-Artzi is a co-founder of Bancor, the Foundation, and LocalCoin; an owner of LocalCoin; the sister of Defendant Guy Ben-Artzi; and the niece of lsraeli Prime Minister Benjamin Netanyahu.  A self-described "native to the California Bay Area," Ms. Ben-Artzi became a serial start-up founder upon her 2004 graduation from Dartmouth College. She has been called the #1 most influential woman in crypto and repeatedly featured in lists of the "most influential" and "top" women in crypto and tech, including CNBC's "10 most influential women in the crypto world."  Her net worth has been estimated at $200 million.  She has made

multiple public appearances to promote the Protocol and solicit investments, including in conferences in New York and San Francisco. She directs and controls the activities of LocalCoin and its employees and personnel in her capacities as an owner and director of LocalCoin and a Bancor co-founder. On information and belief, she controls the activities of the Foundation through her relationship with her brother, Defendant Guy Ben-Artzi. On information and belief, Ms. Ben-Artzi currently resides in Israel.

22.      Defendant Guy Ben-Artzi is a co-founder of Bancor, the Foundation, and LocalCoin; a Director of the Foundation; the brother of Defendant Galia Ben-Artzi; and the nephew of Israeli Prime Minister Benjamin Netanyahu. He directs and controls the activities of the Foundation as its founder and director. He directs and controls the activities of LocalCoin and its employees and personnel in his capacities as a Director of the Foundation, a Bancor co-founder and, on information and belief, through his relationship with his sister, Defendant Galia Ben-Artzi. On information and belief, he currently resides in Israel.

23.      Defendant Eyal Hertzog is a co-founder of Bancor, the Foundation, and LocalCoin, and a Director of the Foundation. He directs and controls the activities of the Foundation as its founder and director. He directs and controls the activities of LocalCoin and its employees and personnel in his capacities as an owner and director of LocalCoin, a Bancor co-founder and as Bancor's "Product Architect." On information and belief, he currently resides in Israel.

24.      Defendant Yehuda Levi is a co-founder of Bancor, the Foundation and LocalCoin, its former Chief Technology Officer, and its current Head of Smart Contracts. He directs and controls the activities of LocalCoin and its employees (*i.e.,* the Bancor "core team") in his capacity as a Bancor co-founder and senior team member. He is a member of Bancor DAO and serves as an Administrator on the Governance Forum under the username "yudi." On information and belief,

he currently resides in Israel.

25.    Defendant BProtocol Foundation is a private corporation formed under Swiss law, with offices in Zug, Switzerland. The Foundation is owned, operated, and controlled by the Individual Defendants and their associates. Defendants Guy Ben-Artzi and Eyal Hertzog have served continuously on its corporate board since its formation in 2017. On information and belief, the Foundation participates in the governance of Bancor DAO and exercises a veto-proof block of votes over DAO governance.

26.    Defendant LocaICoin, Ltd. is a private corporation formed under Israeli law and headquartered in Tel Aviv. Local Coin is owned and operated by Defendants Galia Ben-Artzi, Guy Ben-Artzi, Eyal Hertzog, and several others. On information and belief, LocalCoin is the direct employer of all Bancor personnel.

27.    Defendant Bancor DAO is an unincorporated general partnership that is not registered in any jurisdiction and has no physical office, location, mailing address, directors, or appointed agents. Bancor DAO is comprised of all individual holders of vBNT, a "governance token" native to the Protocol issued to users who deposit crypto assets on the Protocol. Holders of vBNT vote on proposals to govern the DAO. Bancor DAO exists and communicates online, including through a "governance forum" at https://gov.bancor.network/, an online voting mechanism, and a series of other webpages and online channels.

### III.    JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.

29.    This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C.

§ 157(b)(2)(A) and (b)(2)(E). In the event this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments in the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

30.    Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with a case commenced under the Bankruptcy Code.

31.    This Court has specific personal jurisdiction over all Defendants because they have purposefully availed themselves of the privilege of conducting activities in the United States in connection with their fraudulent efforts to induce investment from investors in the United States.

32.    Defendants engaged in conduct that had substantial foreseeable effects throughout the United States and within the State of New York

## IV.    DEFENDANTS FOUND LOCALCOIN AND THE FOUNDATION AND LAUNCH THE PROTOCOL

15.    Individual Defendants Guy Ben-Artzi, Galia Ben-Artzi, and Eyal Hertzog incorporated LocalCoin under Israeli law on or about August 16, 2016.

16.    In or about April 2017, the Individual Defendants incorporated the Foundation under Swiss law. The Foundation's purpose was "the establishment of the Bancor protocol as a global standard for intrinsically tradeable currencies." Defendants Hertzog and Guy Ben-Artzi were identified respectively as "President" and "Member" of the Foundation's board and, on information and belief, they are still members of the board.

17.    The Protocol was proposed in two whitepapers, published in April 2017 and March 2018 by Individual Defendants Guy Ben-Artzi, Galia Ben-Artzi and Eyal Hertzog. The whitepapers proposed "the Bancor Network for decentralized liquidity, based on the Bancor Protocol, which leverages the capabilities of smart contracts to build liquidity into tokens themselves." These

tokens with built-in liquidity were called "smart tokens."  According to the whitepapers, the Protocol would "standardize[] smart tokens, enabling asynchronous price discovery and continuous liquidity for cryptocurrencies using constant ratios of reserve tokens held through smart contracts, acting as automated market makers," or "AMMs."

18.     A key aim of the Protocol was to provide liquidity for users to trade not only tokens such as the widely-adopted Ether (ETH), but also user-generated currencies with a very small market cap.  According to the April 2017 whitepaper, such small-scale cryptocurrencies had previously been "nearly impossible" to trade, since the "current exchange model" required "a certain volume of trading activity… to achieve market-liquidity." The smart tokens proposed by the whitepapers were offered as "a solution to the liquidity problem."

19.     The Bancor Network Token, or BNT, is a smart token that was issued by the Foundation in order to "implement the Bancor protocol" by "providing continuous liquidity while automatically facilitating price-discovery."  BNT was initially sold to the public via an initial coin offering ("ICO").  The ICO took place on June 12, 2017, and, according to Defendants, generated over $153 million.

20.     According to the 2018 whitepaper, only half of the initial supply of BNT was distributed in the ICO.  The other half was retained by the BProtocol Foundation and allocated as follows: 10% to Bancor's "Founders, Team, Advisors and Early Contributors"; 20% to the "Long-term Foundation Budget," and 20% to "Community Grants, Partnerships and Bounties."

21.     On January 8, 2018, the Individual Defendants filed a patent application with the U.S. Patent and Trademark Office for an invention titled "Methods for Exchange and Evaluating Virtual Currency," *i.e.*, the technology underlying the Protocol.  The Individual Defendants were listed as the "inventors" of the Protocol.  The application  was granted, and the Individual

Defendants assigned the patent jointly to LocalCoin and the Foundation. The assignment was recorded by the USPTO on November 13, 2019.

22.     The Protocol was purportedly governed by Defendant Bancor DAO, a "decentralized autonomous organization." Bancor DAO is made up of holders of vBNT, the "voting tokens" that investors receive when they deposit assets in liquidity pools. All decisions affecting the Protocol must be proposed to and voted on by the DAO. The Individual and Entity Defendants claimed to have transferred governance of the Protocol to Bancor DAO but, as set forth below, they retained control over both the Protocol and the DAO.

23.     Defendants launched Version 1 of the Protocol in or about the winter of 2017, followed by v2 in April 2020 and v2.1 in October 2020.

24.     The Protocol "introduce[d] a new standard for enabling liquidity between tokens through a network of interconnected smart contracts." These "smart contracts" are the liquidity pools in which investors deposit their crypto assets, which "act[] as an automated-market maker that performs on-chain, peer-to-contract token trades and generates a fee from each trade."

25.     Unlike traditional exchanges, which require matching a buyer and seller of a given asset, liquidity pools "instead use on-chain 'reserves' as always-available liquidity sources, they have the potential to remove a token's dependency on trade volume and ensure constant liquidity for tokens."

26.     In order to function properly, the Protocol needed liquidity providers, or LPs, to deposit their crypto assets in the liquidity pools to act as the "reserves" necessary to facilitate trading.

27.     There was a huge obstacle to attracting LPs to the Protocol, however: impermanent loss.

28.     As explained by Nate Hindman in a post on the Bancor blog entitled "Beginner's

Guide to (Getting Rekt by) Impermanent Loss," "impermanent loss is the difference between

holding tokens in an AMM and holding them in your wallet. It occurs when the price of tokens

inside an AMM diverge[s] in any direction. The more divergence, the greater the impermanent

loss."  The loss is "impermanent" because the relative prices of the tokens could return to what

they were at the time the investor deposited their tokens, and the loss would then "disappear."

However, as Hindman wrote, that "is rarely the case. More often than not, impermanent loss

becomes *permanent*, eating into your trade income or leaving you with negative returns."

29.     As Hindman further explained, impermanent loss occurs because of "how AMM

pricing works and the role arbitrageurs play":

> In their raw form, AMMs are disconnected from external markets. If token prices
> change on external markets, an AMM doesn't automatically adjust its prices. It
> requires an arbitrageur to come along and buy the underpriced asset or sell the
> overpriced asset until prices offered by the AMM match external markets.
>
> During this process, the profit extracted by arbitrageurs is effectively removed from
> the pockets of liquidity providers, resulting in impermanent loss.

30.     Few potential liquidity providers were interested in depositing their crypto assets

with the Protocol when they were likely to come out ahead by simply holding those assets instead.

## V.     DEFENDANTS OFFER IMPERMANENT LOSS PROTECTION

31.     In order to overcome the problem of impermanent loss and attract more investors

to the Protocol, Defendants introduced impermanent loss protection ("IL Protection") in Version

2.1.

32.     Defendants promised that if you deposited 100 of a given token ("TKN") in a

liquidity pool in v2.1, the Protocol would "protect the value of your 100 TKN, regardless of their

price. Meaning, you can enter a pool with TKN worth $100 and withdraw tokens worth $200 if

the TKN price has doubled in the market."

33.    As Defendants explained, v2.2 of the Protocol "us[ed] an elastic BNT supply" to "co-invest[] in pools alongside LPs and cover[ed] the cost of impermanent loss with swap fees earned from its co-investments."

34.    Under v2.1, IL Protection was not offered for the first 30 days of a new deposit. After the initial 30 days, an LP would have 30% coverage and would receive an additional 1% of coverage for each day the assets remained in the Protocol.  After 100 days, a deposit would have 100% IL Protection, and "any impermanent loss that occurred in the first 100 days or any time thereafter [was] covered by the protocol at the time of withdrawal."

## VI.    DEFENDANTS LAUNCH V3 OF THE PROTOCOL

35.    Defendants announced the upcoming launch of v3 on November 28, 2021, and began marketing it to potential investors.

36.    In or about March 2022, Defendants proposed the terms of v3 to the Bancor DAO by posting a Bancor Improvement Protocol ("BIP") titled "BIP15: Proposing Bancor 3" on the Governance Forum.  BIP15 described the material terms of v3, including the most important upgrade: instant 100% impermanent loss protection.

37.    Version 3 of the Protocol did away with the 100-day vesting schedule previously in place and instead offered LPs immediate 100% protection from IL.  Notably, BIP15 provided that under v3, an LP's investment would be both "immediately and ***permanently*** protected against the effects of" impermanent loss:

### Impermanent ("Divergence") Loss Protection

- The value of a user's principle, and all fees and rewards earned thereon, are immediately and permanently protected against the effects of price divergence (the phenomenon commonly referred to as "impermanent loss").
- The 100-day insurance vesting schedule of version 2.1 is replaced with an effectively

instantaneous insurance policy, contingent on the following criteria:

- o The pool is sufficiently liquid, such that a minimum balance of 1000BNT (adjustable by the DAO) remains after the withdrawal is processed by the protocol.
- o The user completes a mandatory 7-day "cooling off" period, wherein the user forfeits any rewards and fees that have accrued during this time. The user may elect to cancel their withdrawal, at which time any forfeited fees and rewards are immediately returned to their withdrawable balance. In the event that a user completes the withdrawal at the conclusion of the cooling off period, the rewards and fees accrued on their stake during the cooling down period are distributed to the remaining liquidity providers.
- o A 0.25% exit fee (adjustable by the DAO) is introduced, whereby a fixed proportion of the total value of the pool tokens being liquidated is forfeited at withdrawal. The exit fee is simply deducted from the user's withdrawal and left as residue inside the pool; it has no effect on the ROI of remaining users.

38.     While BIP15 provided that certain aspects of v3 would be "adjustable by the DAO," it did *not* state that the permanent protection against IL would be "adjustable."

39.     An article available on the Bancor website in May 2022 entitled "How does Bancor IL protection work" confirmed that v3 of the Protocol "removes IL risk for LPs." It further stated that for new deposits, IL protection "immediately kicks in for complete protection" and that LPs would be able to "withdraw *at least* the equivalent value" of their deposit, plus fees and rewards:

Impermanent loss (IL) occurs in AMM pools when the prices of the tokens in a pool diverge in any direction. The more divergence, the greater the IL, reducing an LP's profits from trading fees & rewards.

Bancor removes IL risk for LPs and transfers it to the Bancor protocol, which aggregates and backstops IL risk across its pools. The protocol uses fees earned from its co-investments to compensate for the network-wide cost of IL. While some pools may have high IL & low fees, others may have low IL and high fees. If there aren't enough fees to fully compensate an LP's IL at the time of their withdrawal, the protocol mints BNT to cover the delta.

When a user makes a new deposit, the insurance policy immediately kicks in for complete protection, subject to 0.25% withdrawal fee and a 7 day cool-down withdrawal period.

This means that even if a token moons in price [i.e., "goes to the moon," or experiences a significant price increase], an LP is entitled to withdraw the full value of their tokens as if they held them in their wallet, so long as the LP has accrued

full protection. For example, if an LP deposits 1 ETH, and the ETH price doubles, the LP can still withdraw *at least* the equivalent value of 1 ETH back, plus fees & rewards.

(emphasis in original).

40.     Another article available in May 2022 on the Bancor website entitled "Can I lose my IL protection?" stated that an LP that deposited funds in v3 or upgraded their investment from a prior version ***could not*** lose their IL protection:

> If you deposited on Bancor 3 or migrated from the previous version or protected funds at risk from other protocols, ***you cannot lose your impermanent loss protection***. Once deposited, you are protected from day one, subject to a 7 day cooldown period and 0.25% withdrawal fee. The cooldown is necessary to prevent abuse, and financial exploits. Once withdrawal is initiated, the user can confirm and complete withdrawal any time after the 7th day. During the 7 days, there will be no rewards nor trading fees generated (the user's withdrawal value does not change). The user will have an option to cancel; the cooldown can be reversed. If the user reverses the cooldown – it is the same as never starting it. All trading fees and rewards are returned.

(emphasis added).

41.     In addition, BIP15 stated that "Bancor 3 is under the exclusive control of Bancor DAO. The existing governance policies and processes are inherited by the new release, and vBNT continues to serve as the voting token."

42.     Other BIPs set forth additional terms of v3. BIP16 provided for the launch of a beta version of v3; BIP17 proposed an initial list of crypto assets eligible for trading on v3; and BIP 18 set forth v3's "liquidity mining rewards" – a form of interest earned by LPs.

43.     Defendants actively marketed v3, including by promoting IL Protection, in order to attract new LPs and convince existing LPs to migrate from v2 or v2.1 to v3.

## VII.   DEFENDANTS CREATE THE MULTI-SIG AND GIVE IT LIMITED POWERS

44.     Concurrent with the launch of v3, Defendants created the "Multi-Sig," a group of signatories that would execute the decisions of the Bancor DAO.

45. BIP21 set forth a "DAO Multisig Intervention Policy," pursuant to which the Multi-Sig would be authorized to take certain emergency actions prior to a vote of the DAO. The summary of the proposed policy provided that "[t]he prerequisites for whitelisting a token on Bancor are in place to prevent attempted exploits of the Bancor protection mechanism…However, hacks and exploits, and coordinated exits ("rug-pulls") affecting a token that has passed the vetting process can still become a threat to the system…This proposal provides a detailed policy whereby the Bancor DAO can intervene in the operation of affected pools, immediately after a token has become compromised."

46. BIP21 provided more details as to why it was necessary to give the Multi-Sig these emergency powers:

Some Threats Cannot be Anticipated on Long Time Horizons

The prerequisites for whitelisting a token on Bancor provide a helpful filter against predictable security risks. A reasonable scope of common abuse vectors are covered that provide a high level of protection from deliberate exploit attempts, hacks, and other nefarious behavior that could allow an antagonist to siphon value from the network. However, an element of risk will always persist, where events elsewhere in the Defi ecosystem can affect the health of a pool, regardless of the community's diligence during whitelisting.

There are an infinite number of possible scenarios where a fully-audited, vetted and community-approved token for a respectable and trustworthy project can turn malignant. For example, a large reservoir of the token could be drained from another protocol, AMM or otherwise, which could then be used to perform a very large trade on Bancor. In such a scenario, neither the token's ERC20 contract nor the team that created it are at fault, and anticipating these types of attack vectors for all tokens on our network is simply untenable.

47. According to BIP21, the DAO voting process was "[e]ffective, but [s]low":

The time interval between the appearance of a well-considered and polished proposal…, and executing the relevant actions following a successful DAO vote is simply too long to be a tenable route to intercepting an apparent threat, after it is discovered. Moreover, the fact that such a proposal exists serves to advertise the exploit opportunity, heightening the risk that an antagonist might act on it. In short, the existing channels for the DAO to exercise its powers are rendered impotent in

the face of an oncoming and imminent attack, or an exploit in an external contract that can damage the protocol unintentionally.

48.    BIP21 further provided that "[t]he actions that the mult[i]-sig authority may take prior to a formal DAO vote are strictly limited":

> To prevent **theft**, or another problem **arising from a known issue affecting certain tokens**, the DAO will allow the mult[i]-sig authority to temporarily cease swaps and liquidity provision to affected pools, as required. These actions need not be executed together; depending on the nature of the perceived threat, it may only be necessary to exercise only one of these options rather than all of them. Importantly, user withdrawals must not be inhibited.

(emphasis added).

49.    As drafted, therefore, BIP21 addressed issues that might arise with whitelisted tokens that, while they had been thoroughly vetted, might still be subject to "hacks and exploits" or "coordinated exits."   The proposal was meant to provide "protection from deliberate exploit attempts, hacks, and other nefarious behavior," and the Multi-Sig was empowered to act "in the face of an oncoming and imminent attack, or an exploit in an external contract that can damage the protocol," or to "prevent theft" or a "problem arising from a known issue affecting certain tokens." The powers given to the Multi-Sig to affect the operations of the Protocol were "extremely limited," and it was only authorized to take specified actions, "temporarily ceas[ing] swaps and liquidity provision to affected pools," "after a token has become compromised."

50.    BIP21 required that any action taken by the Multi-Sig later be ratified by a vote of the Bancor DAO.

51.    BIP21 was approved by a vote of the Bancor DAO on or about April 15, 2022.

52.    BIP22 proposed the creation of the Multi-Sig described in BIP21.  BIP22 set forth the following "Powers of the[] Bancor DAO MSIG":

- The Bancor DAO MSIG governs all aspects of Bancor V3 and is responsible for the execution of decisions that are made by the Bancor DAO.

- In emergency situations, the Bancor DAO MSIG can call the "pause" function which will pause the entire protocol. As long as the "pause" is ongoing, no deposits, withdrawals or transactions can be made until the protocol is "unpaused."

53.     In addition to the emergency powers given to the Multi-Sig in BIP21, therefore, the Multi-Sig also had the power to pause the entire Protocol.

54.     BIP22 provided that the Multi-Sig would have seven signatories, including three proposed by the Foundation and four proposed by "other crypto projects." The names of the signatories were not disclosed.

## VIII.    DEFENDANTS KNOWINGLY MISREPRESENTED KEY FACTS ABOUT IL PROTECTION

55.     Despite their promises of IL Protection, Defendants knew that they could not in fact guarantee that all LPs would receive 100%, permanent protection against IL.  On Bancor's website and various social media platforms, Defendants repeatedly misrepresented material risks and features of v3, including IL Protection.

56.     For example, in a May 27, 2022 "fireside chat" posted to YouTube, for example, Head of Research Mark Richardson claimed, "[W]e're generating some of the most competitive returns anywhere in DeFi without asking users to take on any risk. I have nothing to be afraid of." He also said that "with BNT, [a death spiral] is literally impossible."  These statements were false when made, as Defendants knew and subsequent events would prove.

57.     Defendants claimed that IL Protection would be paid for by fees generated by the Protocol.  At all times, however, Defendants knew that the Protocol had never generated sufficient fees to cover all unrealized IL in the system. IL Protection therefore was *not* guaranteed to all LPs and, contrary to Richard's assertion, a death spiral was entirely possible – indeed, that is exactly what took place, little more than a month after v3 was launched.

58.     Reports that Defendants commissioned from the economic consulting firm Topaze

Blue in late 2020 (the "Topaze Blue Reports") confirmed that the Protocol was not generating sufficient fees to cover all IL. The Topaze Blue Reports analyzed the Protocol's performance, including whether the Protocol was generating sufficient fees to pay for IL Protection.

59.     According to a Topaze Blue report from July 2021, the fees generated by the Protocol covered only 31% of IL. That report stated that the Protocol had collected only 6.85 million BNT in fees, while the amount of IL in the system was worth 22.21 million BNT. A chart from the July 2021 reported showed the difference between the IL in various liquidity pools and the fees that those pools had generated:

## Impermanent loss and fees



60.     On information and belief, the Topaze Blue Reports were shared with Defendants and other high-ranking Bancor developers and Foundation members. The reports and their contents were *not*, however, shared with LPs.

61.     The information in the Topaze Blue Reports shows that the Protocol was unable to compensate LPs in the event of a mass withdrawal, which later transpired.

62.     For instance, on January 12, 2021, Defendants tweeted that "protocol revenue is covering the cost of IL protection." In fact, Bancor's fees were sufficient to cover only 40% of IL protection in January 2021. On January 15, 2021, Bancor tweeted that "the cost of Bancor's impermanent loss insurance is far exceeded by revenue earned by the protocol from swap fees." However, on both January 12, 2021 and January 15, 2021, the Topaze Blue Reports showed that the Protocol's fees covered only 46% and 40%, respectively, of Bancor's IL Protection obligations.

63.     On October 25, 2021, Bancor's Head of Growth Nate Hindman advertised that IL Protection was covered by fees generated from Protocol-owned liquidity and that "the model has sustained itself for a year now," despite knowing that – in all the months analyzed by Topaze Blue – the fees had never been sufficient to cover IL Protection for all LPs.

64.     On January 8, 2022, Hindman tweeted that Bancor's "trading fees" pay for IL Protection, and that "[t]he protocol always aspires to achieve network fees > network IL and has done so effectively." These statements are false, as the Topaze Blue Reports show that the fees were never sufficient to cover "network IL," *i.e.*, all unrealized impermanent loss in v3 of the Protocol.

65.     Defendants knew, based on the Topaze Blue Reports, that the Protocol did not earn enough fees to cover all unrealized impermanent loss. Defendants also knew, based on the Reports, that if – as later happened – a large number of LPs withdrew their investments in a short period of time, the fees earned by the Protocol would not be sufficient to cover LPs' impermanent loss, and the Protocol would have to rely on assets deposited by other LPs to cover the withdrawals. LPs' investments therefore were not "100% protected" from impermanent loss. Despite this knowledge,

Defendants did not retract, and continued to make, statements that LPs were 100% protected from IL and that they **could not lose** their IL protection.

66.    Celsius relied on Defendants' misrepresentations and omissions to its detriment. Had Celsius known that, contrary to Defendants' statements, its investment was not 100% protected from impermanent loss, it would not have invested in v3 or would have demanded more favorable terms for its investment. Instead, and as a consequence of Defendants' misrepresentations, Celsius lost millions of dollars' worth of crypto assets.

## IX.    COMMUNICATIONS FROM BANCOR IN RESPONSE TO CELSIUS' DUE DILIGENCE PRIOR TO UPGRADING TO AND WITHDRAWING FROM V3

67.    Celsius began depositing assets in the Bancor protocol in or around March 2021.

68.    On January 31, 2022, in a Telegram chat between Bancor and Celsius employees, Rajiv Sawhney of Celsius asked "when will version V3 go mainnet?" Mark Richardson of Bancor responded that v3 was "[s]till on track for Q1" and that they "should be able to release details on a schedule in the next couple of weeks." Richardson stated that there would be "a beta test [and] public bug bounty, prior to the full migration," and that there was "[s]till some work to do," including "waiting for audits." Sawhney responded that Celsius was "keen on Bancor strategies/opportunities," and Richardson replied that he would "make sure you guys are kept up to date as we approach launch."

69.    V3 launched on May 11, 2022.  Shortly thereafter, Celsius upgraded a wallet containing over 28,000 ETH from Version 2 to Version 3 of the Protocol.  In deciding to upgrade to v3, Celsius relied on Defendants' public statements promising immediate 100% impermanent loss protection and maximum slippage of .25%. Celsius further relied on information from the Bancor website and the Bancor decentralized app ("dApp") that showed how much Celsius would receive if it withdrew its ETH from v2 versus what it would receive if it upgraded to v3 before making

withdrawals.

70.     On May 20, 2022, in another chat between Bancor and Celsius employees, "CryptoJ" of Celsius asked the "Bancor team": "We noticed there is a privileged account Role_admin. Is this a multi-sig account if so who and how many? Also when will the other security audits be released?" Eissa Kazi of Celsius added "[o]ne additional question…I[f] we migrate over our v2 position, how does the IL accounting work when it hits v3. Do we get stuck with the BNT for the IL compensation from v2 or are we made whole in our other asset during the migration[?]"

71.     The following day, Gerrit van Wingerden of Celsius followed up: "Related to Eissa's question. If we had a v2 position in token A that would give us 50% BNT and 50% Token A if we withdrew, is it possible upgrading to v3 and withdrawing would give us more than 50% of token A or would the split always be the same?" Glenn of Bancor responded: "Re superliquidity, we currently make tokens that aren't paired with BNT trading liquidity available for flashloans. On the audit side, we have one completed audit at the moment and we will publishing the second soon as well. They will be made available in our docs (https://docs.bancor.network/about-bancor-network/security-and-audits) as we upload them."

72.     On May 23, 2022, Kazi wrote: "thanks for your response. Can you also confirm that if we migrate our position that has significant IL that was compensated in BNT on v2 that it would be also paid out in BNT if we withdrew from v3 or would it be made whole in the other token it was paired with?" And CryptoJ wrote: "Thank you, I also was wondering about the privileged account role_admin is it multisig? If so who and how many? Is there an ETA of the second audit also?"

73.     Glenn did not respond to Eissa's question, but in response to CryptoJ wrote that "The admin is an EOA for the next few weeks before moving to the Bancor DAO multisig

(https://gov.bancor.network/t/bip22-the-bancor-dao-multisig/3578). It's highly secure (not accessible to us without an explicit approval process) and is needed at this early stage as we scale up version 3 of the Bancor protocol for quick response in case of an emergency."

74. On or about May 25, 2022, Celsius began a withdrawal of 2800 ETH from v3.

75. On May 27, 2022, van Wingerden wrote in the Celsius-Bancor chat: "I've done a withdrawal from v3 and the GUI [graphical user interface] seems to indicate that we will get everything in ETH (in v2 if we withdrew the GUI and some of the withdrawal would be in BNT it would clearly state the split between BNT and ETH). However, when we do a TX [transaction] simulation with a future (> 7 days from time of initWithdrawal) and look at the state change it seems we are receiv[i]ng a mix of both ETH and BNT (roughtly [*sic*] 1/3 2/3 split). We really need to understand a-priori what composition of BNT/ETH we will get before we initiate a withdrawal. Can you please provide some colour on what the ETH amount in the pending withdrawals refers to?"

76. Glenn responded: "Once the cooldown is over (at the end of the 7 days), you should then be able to withdraw from the GUI. The prompt to initiate the withdrawal will have the output breakdown of how much you receive in TKN and BNT (if there is any given)."

77. On the following day, Richardson further responded to van Wingerden's question: "Hey! I can help provide some insight here I think we should set up a call, and I can show you how to determine the breakdown, and even how to withdraw such that everything is given back in eth. This is a threshold parameter. But easy to simulate and calculate."

78. Van Wingerden and Richardson made plans for a phone call later that day. Van Wingerden then asked: "[By the way] when you say we can withdraw everything into ETH does that mean that you would automatically sell the BNT portion of our position into ETH inside of

Bancor [BNT]?"

79.     Richardson responded: "Kind of. It's not that simple, but similar. You can treat it that way."

80.     Richardson and van Wingerden had a call later that day, during which they discussed Celsius' planned withdrawals from v3 and what percentage of any withdrawal would be paid out in ETH versus in BNT.  Following the phone call, Richardson sent van Wingerden a spreadsheet demonstrating what the breakdown between ETH and BNT would be.

81.     On May 29, 2022, Asaf Shachaf of Bancor wrote in the chat: "[T]he actual breakdown is determined on the actual withdrawal. [M]eaning, when you complete the cooldown phase and click the 'withdrawal' option, it will be able to indicate the breakdown based on the current pool conditions. [T]his changes every block based on the pool status.'"

82.     Van Wingerden responded: "Thanks Asaf. My (perhaps mistaken) unde[r]standing from speaking with Mark yesterday was that v3 GUI currently doesn't display the breakdown even after you choose to withdraw after the cooldown period and the only way to find [out] is to withdra[w]. Am I mistaken? Also Mark mentioned that Nicholas may be able to provide a Python script that would allow us to determine our current breakdown. It would be very helpful if we could get this as we are trying to get a handle on our current BNT exposuire. [*sic*]  Or just an outline of the logic e.g. that reference calls to the SC contract would suffice as well and we could write our own script."  Shachaf did not respond to van Wingerden's questions.

83.     In a June 10, 2022 chat, Tiago Silva of Bancor wrote that a CEL liquidity pool had been created in v3 and that liquidity could be migrated from v2.1 to v3.  Silva further wrote that "[t]here is a 0.25% withdrawal fee and 7 day cooldown period for any stakes on Bancor 3 to be withdrawn," and that "Impermanent Loss Protection goes from x% on Bancor v2.1 to instant 100%

on Bancor 3." Silva then provided step-by-step "instructions to migrate liquidity from Bancor v2.1 to Bancor 3."

84.     Celsius reasonably relied on each of these communications from Bancor employees in deciding to upgrade from v2.1 to v3 and in withdrawing its investment from v3.

85.     Celsius continued to withdraw ETH from v3.  By June 22, 2022, it had withdrawn nearly 14,000 ETH, leaving a total of 14,878 ETH still invested in the Protocol.

## X.     BANCOR ENTERS A "DEATH SPIRAL" AND DEFENDANTS "PAUSE" IL PROTECTION

86.     On May 16, 2022, days after the launch of v3, Rich Barber, a LocalCoin employee, claimed that Bancor's "very sound treasury" and "ample protocol owned liquidity" would prevent "anything catastrophic happening due to market price action."  Hindman further assured liquidity providers that "the overall value of your deposit is fully protected" because "part of your deposit can be received in an equivalent value of BNT."  On May 19, 2022, Richardson affirmed that a "death spiral is literally impossible" in a videotaped interview. These representations were knowingly false.

87.     On June 10, 2022, the price of BNT fell from $1.30 to $1.22.  By June 17, 2022, the price of BNT had fallen to $0.55.  At the same time, withdrawals by LPs were increasing.

88.     A "death spiral" would be caused by increased withdrawals, which would lead to larger deficits in the liquidity pools of the tokens being withdrawn.  These deficits would require the Protocol to mint increased amounts of BNT to cover the promised IL protection.  The LPs would then sell these BNT into the market to repurchase the tokens they had initially deposited in the Protocol, which would drive down the price of BNT. The lower the price of BNT, the more BNT the Protocol would have to mint to provide IL protection, driving the price of BNT further and further downward.

89.    On June 19th, Defendants announced that IL protection had been "paused." In a blog post on medium.com, Defendants stated that, "[d]ue to hostile market conditions," IL protection had been "temporarily disabled." The blog post further stated that "IL protection is expected to be reactivated on the protocol as the market stabilizes. This is a temporary measure to protect the protocol and its users." This statement was false, as IL Protection was never reactivated.

90.    The blog post continued:

- There is no ongoing attack and funds on the protocol are secure.

- Withdrawals performed during this unstable period will not be eligible for IL protection. Users who remain in the protocol will continue earning yields and be entitled to withdraw their fully-protected value when IL protection is reactivated.

- We are working to get IL protection reactivated as soon as possible.

- Trading remains active on all liquidity pools on the network.

- Deposits are currently not accepted to prevent confusion via direct contract interaction where the information on paused protection is not visible.

- The Bancor DAO will be asked to approve the temporary IL protection pause by a ratification vote, as outlined in BIP21.

91.    The blog post gave the following purported reasons for the "pause" of IL protection:

The need to pause IL protection is a result of the recent sell-off of rewards emissions that were accumulated over the last 18 months. BNT rewards effectively have a double-cost:

1. They depreciate the BNT value, increasing impermanent loss on the network.
2. This IL is compensated with additional BNT emissions, causing sales that result [in] further value depreciation.

These costs have been amplified by the recent insolvency of large centralized entities who were key beneficiaries of BNT liquidity mining rewards as long-time LPs in Bancor. To cover their liabilities, these entities have rapidly liquidated their BNT positions while withdrawing large sums of liquidity from the system, exposing this unforeseen economic vulnerability in the protocol.

92.    In response, LP withdrawals from Bancor liquidity pools continued to increase, and

the price of BNT continued to fall.

## XI. PAUSING IL PROTECTION WAS NOT AUTHORIZED BY BIP21

93.     Defendants claimed that pausing IL protection was authorized by BIP21. However, the stated reasons for suspending IL Protection – the "sell-off of rewards emissions" that led to depreciation in the value of BNT, and "large centralized entities" that "liquidated their BNT positions while withdrawing large sums of liquidity" – did not fall within the limited circumstances in which the Multi-Sig was authorized to act under BIP21.

94.     An August 19, 2022, post on medium.com from "members of the BProtocol Foundation Council" similarly admitted that the circumstances that led to the "pause" of IL Protection were not covered by BIP21.  The Foundation Council members stated in the post that "Bancor's impermanent loss (IL) protection mechanism was disabled" "due to a vulnerability in the design of the Bancor protocol under unforeseen circumstances."

95.     As set forth fully above, BIP21 was focused on threats from tokens *other than* BNT that, while they had been thoroughly vetted and whitelisted, might still be subject to "hacks and exploits" or "coordinated exits." BIP21 authorized the Multi-Sig to act "immediately after a token has become compromised" in order to provide "protection from deliberate exploit attempts, hacks, and other nefarious behavior." The Multi-Sig was empowered to act "in the face of an oncoming and imminent attack, or an exploit in an external contract that can damage the protocol," or to "prevent theft" or a "problem arising from a known issue affecting certain tokens."

96.     None of these circumstances were present prior to the "pause" of IL protection. Indeed, Defendants specifically stated that there was "no ongoing attack."  No tokens were compromised, no hacks took place, and there were no deliberate exploit attempts.  Rather, the problem was "a vulnerability in the design of the Bancor protocol under unforeseen circumstances," – *i.e.*, the price of BNT falling rapidly while many LPs simultaneously withdrew

their investments.

97.    Withdrawing IL protection therefore was not authorized by BIP21 and constituted

a breach of the agreement between Defendants and investors in the Protocol, including Celsius.

98.    Despite the fact that the "emergency action" taken by the Multi-sig on June 19,

2022 was not authorized by BIP21, Defendants acted as though it were, and the DAO sought

ratification of the decision pursuant to BIP21.

99.    In a post proposing ratification of the DAO's emergency action, the explanation of

the actions that Defendants had actually taken changed; rather than stating that the Protocol had

"paused" IL protection, Defendants now explained that they had in fact suspended the mining of

BNT:

> BNT minting, normally used to cover impermanent loss insurance and deficits in
> withdrawals, was halted. The reason being, at the time, pending withdrawals in
> combination with the impermanent loss protection…could have crashed the BNT
> price to essentially zero, leading to a situation in which the recovery of funds for
> all liquidity providers would have been in peril.

100.    The post likewise changed the purported reasoning behind the decision to take

emergency action:

> During the week leading to the emergency decision, the following actions and
> protocol behavior were observed:
>
> 1.  A clear pattern in which big withdrawals were made, received BNT
>     compensation and immediately sold the BNT tokens leading to suppression
>     of the BNT price.
> 2.  A growing short position on the token as evidenced by the open interest on
>     FTX and OKEx, that happened to coincide with these withdrawals,
>     suggesting an opportunist was seeking to benefit from the oncoming
>     cascade.
>
> The forecasted effects in a worst case scenario for Bancor liquidity providers, and
> the protocol itself, were severe enough to warrant an emergency intervention.

101.    Defendants also attempted to claim their definition of "impermanent loss" *included*

the rebalancing losses that LPs suffered. Defendants asserted that "the process by which BNT is distributed to cover deficits has been referred to as Bancor's 'Impermanent Loss Protection mechanism'. But in reality, IL is a bit of a misnomer and IL may not be the best term for it since the BNT distribution mechanism covers more than that."

102.    But this, too, was a misrepresentation and an attempt by Defendants to deflect responsibility.  Both a website devoted to Bancor's promotion of IL Protection and the Protocol's development notes include the standard definition of impermanent loss: the value of tokens in a liquidity pool as compared to the value of simply holding the tokens. Defendants' attempt to cover their tracks can only be explained if they knew they had misrepresented the treatment of rebalancing losses.

## XII.    CELSIUS WITHDRAWS ITS REMAINING INVESTMENT FROM V3

103.    At the time that Defendants improperly suspended IL protection and token rebalancing on June 19, 2022, Celsius had 14,878 ETH remaining in v3 of the Protocol.

104.    Celsius employees, who recognized that Defendants were misusing BIP21 to improperly pause IL protection, initially remained hopeful that the pause would be temporary, as Defendants had stated publicly and in Bancor blog posts.

105.    Given the deteriorating market conditions and the rapidly dropping price of BNT, however, Celsius determined that the best course of action would be to withdraw the remainder of its investment. Although it faced steep losses by doing so, Celsius risked losing its entire investment if the Protocol collapsed.

106.    From June 23 through 27, 2022, Celsius withdrew 14,878 ETH from the Protocol. Because Defendants had improperly suspended IL protection and token rebalancing, Celsius received only 8,338 ETH.  Celsius therefore lost 6,540 ETH, which had a market value at the time of approximately $7.8 million.   The current value of the 6,540 ETH that Celsius lost is

approximately $21.5 million.

## XIII.    THE DEFENDANTS ARE ALTER EGOS OF ONE ANOTHER

107.    The Individual Defendants and the Foundation dominated and controlled the Protocol, Bancor DAO, and LocalCoin to their own benefit and to the detriment of liquidity providers.

108.    There is a lack of corporate formalities between the Entity Defendants and Bancor DAO.  For example, "Bancor" employees are employed by LocalCoin, but perform work for the Protocol and are paid with funds held by the Foundation.

109.    While there is no entity named "Bancor," the Individual Defendants routinely used the term "Bancor" to refer to the Protocol, the Foundation and/or the DAO in public statements, on the "Bancor" website, and in blog posts on medium.com.  Similarly, "Bancor" employees – who were actually employed by LocalCoin – referred to themselves as working for "Bancor."

110.    There is an overlap in ownership and directors amount the Entity Defendants, as the Individual Defendants own and operate LocalCoin and two of them – Guy Ben-Artzi and Eyal Hertzog – are on the Board of the Foundation.

111.    In addition, the Foundation holds and controls the $153 million raised by the BNT ICO, and it uses those funds to control the operations of the Protocol and the Bancor DAO. The Foundation decides which Protocol operations to fund, what Bancor DAO decisions to nullify by withholding funding, what employees to hire (through LocalCoin) and how much to pay them, and what consultants to hire, among other things.  The Foundation does not disclose whether it pays compensation to any of the Individual Defendants and, if so, what the terms of such compensation are.

112.    The Foundation also engaged LocalCoin as the "core developer for the Bancor Protocol." The Foundation has not disclosed any information about the terms of this engagement,

including how much it has paid to LocalCoin which, again, is owned and operated by the Individual

Defendants, and any payments the Foundation makes to LocalCoin therefore redound to the benefit

of the Individual Defendants.

113.    In addition, the Foundation controlled the DAO by holding a veto-proof majority

of vBNT, the voting tokens used to vote on Bancor governance matters.  The Foundation used its

control of vBNT to overrule decisions made by the other holders of vBNT so as to increase its own

profits from Protocol operations (while simultaneously putting the Protocol's solvency at risk).

**XIV.   CAUSES OF ACTION**

<u>**FIRST CAUSE OF ACTION**</u>
Breach of Contract (Against All Defendants)

114.    Plaintiff incorporates paragraphs _-_ above as if fully set forth herein.

115.    BIP15 (setting forth the terms of v3), BIP16 (describing the beta release of v3),

BIP17 (describing initially available tokens and describing certain fees including swap fees),

BIP18 (describing v3's liquidity mining rewards), and BIP21 and BIP22 (describing the DAO

Multi-Sig authority and its limited powers) constituted a binding contract between Celsius and the

Protocol and Bancor DAO.

116.    Celsius accepted the terms offered by the Protocol and Bancor DAO in these BIPs

when it upgraded from v2 to v3.

117.    Celsius fully performed its obligations under the contract by depositing over 28,000

ETH in v3.

118.    The Protocol and Bancor DAO breached the contract by failing to provide IL

protection to Celsius when it withdrew its investment from the Protocol.  Specifically, from June

23 to 27, 2022, Celsius withdrew 14,878 ETH from the Protocol but received only 8,338 ETH.

Defendants breached the contract by failing to provide IL protection for the value of the remaining

6,540 ETH.

119.     The Individual Defendants and the Foundation are liable for the Protocol and Bancor DAO's breaches as alter egos.

120.     Celsius suffered damages as a direct result of Defendants' breach in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Unjust Enrichment (Against All Defendants)

121.     Plaintiff incorporates paragraphs _-_ above as if fully set forth herein.

122.     As set forth above, Defendants were enriched at the expense of Celsius by suspending IL protection and failing to mint the BNT required to cover the difference in value between the 14,878 ETH that Celsius withdrew and the 8,338 ETH it received.

123.     It is against principles of equity and good conscience to permit Defendants to retain the value of the 6,540 ETH that they withheld from Celsius.

## THIRD CAUSE OF ACTION
### Fraudulent Inducement (Against All Defendants)

124.     Plaintiff incorporates paragraphs _-_ above as if fully set forth herein.

125.     As set forth fully above, Defendants made multiple material misrepresentations of fact to Celsius, including, but not limited to:

    a.    Falsely stating that "Bancor removes IL risk for LPs and transfers it to the Bancor protocol."

    b.    Falsely stating that under v3 of the Protocol, "[t]he value of a user's principle, and all fees and rewards earned thereon, are immediately and permanently protected against the effects of price divergence."

    c.    Falsely stating that LPs who deposited assets in v3 or who migrated their assets from a prior version "cannot lose [their] impermanent loss protection."

    d.    Falsely stating that Celsius would receive 100% of its investment in ETH when it made withdrawals

126.    Defendants made these statements with knowledge of their falsity and with the intent to defraud.

127.    Celsius reasonably relied on the misrepresentations.

128.    As a result, Celsius was damaged when it withdrew 14,878 ETH from the Protocol but received only 8,338 ETH.

## **PRAYER FOR RELIEF**

WHEREFORE, Celsius seeks an Order:

a.  Awarding damages for breach of contract in an amount to be proven at trial;

b.  In the alternative, awarding damages for unjust enrichment in an amount to be proven at trial;

c.  Awarding damages for Defendants' fraudulent misrepresentations in an amount to be proven at trial;

d.  Disregarding the separate corporate forms of Defendants LocalCoin, BProtocol Foundation, Bancor Protocol, and Bancor DAO and declaring them to be alter egos of one another and of the Individual Defendants;

e.  Awarding costs and fees, including but not limited to reasonable attorneys' fees, to the extent appropriate; and

f.  Granting such other and further relief that the Court deems just and equitable.


New York, New York
Dated: July 12, 2024

                              */s/ Denver G. Edwards*
                              **BRADFORD EDWARDS LLP**
                              Denver G. Edwards, Esq.
                              575 Fifth Avenue, 14th Floor
                              New York, New York 10017
                              Tel: (917) 671-9407
                              Fax: (607) 930-3596
                              Email: dedwards@bradfordedwards.com

                              *Counsel to Mohsin Y. Meghji, Litigation*
                              *Administrator for Celsius Network LLC*